.(Nos. 12589-12590.—Appellate Court reversed; superior court affirmed.)

THE WILLIAM E. DEE COMPANY *et al.* Defendants in Error, *vs.* THE PROVISO COAL COMPANY *et al.*—(JAMES S. STEPHENS *et al.* Plaintiffs in Error.)

*Opinion filed October 27, 1919—Rehearing denied Dec. 13, 1919.*

1. PARTNERSHIP—*good will has no value .merely because partnership is a going concern.* Although the good will of a business may be of very great value in the probability that old customers of a firm will continue their custom and recommend it to others, the good will has no value merely because the partnership is a going concern unless the business is operated at a profit.

2. SAME—*what is the value of the good will of a business.* The value of the good will of a business is the sum which any person would be willing to give for the chance of being able to keep the trade connected with the place where the business has been carried on with a profit.

3. CORPORATIONS—*stockholders must make up deficiency where capital stock is paid for with property at an over-valuation.* Payment for capital stock with property is not payment except to the extent of the true value of the property, and if property is taken at an over-valuation the stockholders are liable to make up the deficiency, as the capital stock is a trust fund for the security of the creditors.

WRIT OF ERROR to the First Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. MARTIN M. GRIDLEY, Judge, presiding.

FREDERIC E. VON AMMON, and MARCUS HITCH, (BUTZ, VON AMMON & JOHNSTON, of counsel,) for plaintiffs in error.

FRANK CROZIER, and ALBERT N. CHARLES, (WILLIAM S. CORBIN, of counsel,) for defendants in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

In February, 1901, the plaintiffs in error, James S. Stephens and Oliver J. Westcott, were partners in business as manufacturers of structural iron and steel specialties on premises owned by them adjacent to the Chicago Great Western railway in Maywood, in Cook county, and at that time they started a retail coal business on the same premises under the name of Proviso Coal Company. They conducted the business as a partnership until February 11, 1903, when they obtained a charter changing their partnership in the coal business to a corporation under the same name, with a capital stock of $25,000. They subscribed for the whole stock in equal shares, and adopted a resolution that the corporation should purchase the assets and business of the partnership for $25,000 as full payment of their subscriptions to the capital stock, and certificates were issued accordingly as fully paid. The business was carried on by the corporation until November, 1904, when, the sheds having burned, the capital stock and property were sold to George Bendixen for $3000, payable $500 cash and the balance in notes of small amounts running for a long period of time. Bendixen ran the business until 1911, and having incurred liabilities to creditors, a voluntary assignment was made in the county court and the creditors realized nineteen per cent upon their claims. Defendants in error, who were creditors, filed their bill in the superior court of Cook county under section 25 of the act concerning corporations for pecuniary profit, charging that the property turned over by plaintiffs in error, as partners, to the corporation, of which they were the sole owners, in payment of the entire capital stock, was not worth $25,000, and seeking to charge plaintiffs in error with stockholders' liability. The answer of

plaintiffs in error alleged that the property of the partnership was worth in excess of $25,000 and the capital stock was fully paid. The master in chancery to whom the cause was referred reported that the business and assets of the partnership were well worth the sum of $25,000 and the capital stock was paid for in full with the property, and he recommended that the bill be dismissed for want of equity. The chancellor sustained exceptions to the report and entered a decree finding that the aggregate value of the property conveyed to the corporation was not in excess of $12,600 and that the plaintiffs in error were liable to the extent of $12,400, or $6200 each, and entered a decree accordingly. The plaintiffs in error prosecuted separate appeals to the Appellate Court for the First District, and the appeals were consolidated in that court and errors and cross-errors were assigned. The Appellate Court first affirmed the decree of the superior court, but upon petition for a rehearing by the plaintiffs in error the decree of the superior court was reversed and the cause remanded generally. The defendants in error then filed a petition for rehearing, which was granted, and the decree of the superior court was reversed. The Appellate Court found, and it was admitted, that there had been a mistake of $140 in the cash on hand, which was added to the value of the tangible property. The court also concluded that the good will of the business was worth $5000 and that the tangible property and good will were therefore worth $17,740, and the liability of the plaintiffs in error was for $7260, or $3630 each. The plaintiffs in error petitioned this court for writs of *certiorari,* and an order having been entered consolidating them, the applications were granted. The plaintiffs in error assigned errors on the record and defendants in error assigned cross-errors.

The assignment of errors questions the conclusion of the Appellate Court that the property of the partnership turned over to the corporation in payment for the capital stock was worth only $17,740, and it is insisted that the evidence

shows it to have been worth at least $25,000. There is evidence that the property was worth much more than $25,000, consisting of opinions of public appraisers of similar property who were examined as experts, the opinions of dealers in lumber, coal and ice in Maywood and an adjoining town, and evidence of the great prosperity of the business in a time when the partnership had a monopoly of the coal business in Maywood. The experts were asked to give opinions of the value of the property based on the hypothesis that the business had been carried on for about two years before the incorporation; that Maywood was a rapidly growing village; that the annual tonnage of the business was 5000 tons, averaging eighty cents per ton profit, and that the physical, tangible assets amounted to $17,000. Their opinion was that, adopting a ten per cent basis, the value of the business would be about $40,000, and the difference between the tangible assets of $17,000 and the capitalization of $40,000 would be the value of the good will. They said that $35,000 would be a fair figure for the property, and the good will was worth $18,000, on the supposition that the facts given were true. These opinions have a familiar sound as applied to taking in different plants in a merger into large corporations and undoubtedly exemplify the theory and practice of those who have designs on the pocket-books of the public in forming such mergers. What other or different occasion there was for these witnesses to appraise the property of coal companies does not appear, and one of them testified that he had examined probably over sixty retail coal businesses in taking over coal properties in connection with large mergers of the coal business. Of course, everyone knows that $4000 is ten per cent of $40,000, but there is no evidence that would justify a conclusion that under other conditions than those stated by the witnesses any retail coal business is sold on the basis stated by them. There is not the slightest reason to question the good faith or honesty of plaintiffs in error

or any reason to suppose that they had any evil design against creditors or the public. Of course, they did not anticipate a business failure, but when it occurred the law cast upon them the burden of proving that the property had a cash value equal to the capital stock. Whether the subject was one for expert testimony, or whether the chancellor, having the history of the business, the value of the assets and the amount of business done presented to him, could determine for himself what anyone would be likely to pay for such property, the hypothesis of fact had no substantial basis in the evidence. The business had never yielded a reasonable profit except in the latter part of November and in December, 1902, and January, 1903, when it was impossible for other dealers to get hard coal on account of the strike of that year and the plaintiffs in error had a monopoly of that business at Maywood. At the beginning the plaintiffs in error conducted the business with a manager from the spring of 1901 until October 15, 1902, with little or no profit, and they then discharged the manager and hired a clerk in the office and gave the business considerable personal attention. Soon afterward the strike occurred and other dealers in Maywood could not get any hard coal or a very limited amount. The plaintiffs in error had a contract with the Lehigh Valley Coal Company for coal at $6.50 a ton, which they sold at about $12 a ton, and the people were so anxious to get it that a great deal of it was taken from the cars without handling. They sold a great deal of coal at that time at a large profit, and the sales under those conditions in January, 1903, just before the incorporation, amounted to over 622 tons, which at the same rate would amount to 7500 tons a year. There was no reason, from the history of the business, to suppose that in the future it would amount to 5000 tons a year or that the profits of the business would be $4000. The sales in November, December and January were in the winter season, and at no other time had the plaintiffs in error sold

any such amount. . The good will of a business may be of very great value in the probability that old customers of a concern will continue their custom and recommend it to others, and the value is the sum which any person would be willing to give for the chance of being able to keep the trade connected with the place where business has been carried on with a profit. Any person contemplating a purchase of this property and business, upon investigation would learn that it had not been profitable except for a period in the winter season when the monopoly existed, and we agree with the chancellor that the alleged good will of the business had no value. In argument much is made of the fact that the partnership was a going concern. Of course, if it were not a going concern but had ceased to exist as a business the property would not have had any value for business uses, but if a going concern has made no money no one would pay any more for it because it was going. The errors assigned cannot be sustained.

. The cross-errors question the allowance of $5000 made by the Appellate Court for good will, and the valuations of $3500 for coal sheds, $3000 for the land and switch track, the allowance of more than $760 for outstanding accounts receivable, and the allowance of $200 for the charter of the company. In considering the assignment of errors we have already stated our conclusion as to good will, and the cross-error respecting the same is sustained. It would not profit anyone to recite the testimony concerning the value of the coal sheds and coal, the horses, wagons and implements and the free use of the land and switch track, the title of which remained in plaintiffs in error. The free use of the land and switch track was not mentioned, but it was intended that the corporation should have it and did have it, and when the property and capital stock were sold to Bendixen a lease was given him for five years for one dollar per month. As to the valuations, they were a matter of judgment, and we would not feel that we would be

justified in disturbing them. As to accounts receivable, Westcott testified that his recollection was they amounted to about $6500, and Stephens said that he did not remember what the accounts receivable were; that with cash on hand they amounted to over $8000, but he could not state the proportion. There was no direct evidence what the accounts were worth or what was collected on them. It is contended that it appears from subsequent receipts and expenses that only $760 was collected, but the court cannot say that the allowance by the chancellor of $2300 was wrong. It was admitted in the Appellate Court that there was a mistake of $140 against the plaintiffs in error. On the other hand, the plaintiffs in error counted their charter at $200. It had cost them $70, and if it was a proper charge it was worth no more, and the difference about equaled the $140. Everything considered, the decree was substantially right and a further accounting would not be justifiable.

Property may be taken in payment for stock, but it must be done by a valid contract of bargain and sale. Payment with property for capital stock is no payment except to the extent of the true value of the property, and if property is taken at an over-valuation the stockholders are liable to make up the deficiency. (*Farwell* v. *Great Western Telegraph Co.* 161 Ill. 522; *Sprague* v. *National Bank of America,* 172 id. 149; *Gillett* v. *Chicago Title and Trust Co.* 230 id. 373.) The law required the plaintiffs in error, in paying for their stock, to give money or money's worth to the full amount of their subscriptions. The property was not the equivalent of $25,000 in cash, but the plaintiffs in error, as both sellers and buyers, took their partnership property at an over-valuation. Capital stock is a trust fund for the security of creditors, and the plaintiffs in error are bound to make it good.

Therefore the judgment of the Appellate Court is reversed and the decree of the superior court affirmed.

> *Judgment of Appellate Court reversed.*
> *Decree of superior court affirmed.*