# Joseph T. Ryerson & Son, Appellant, v. Thomas J. Peden et al., Appellees.

## Gen. No. 25,837.

1. CORPORATIONS—*extent to which payment of stock in property good.* A payment for corporate stock with property is good, only to the value of the property.

2. CORPORATIONS—*duty of subscriber to pay for stock.* A subscriber to capital stock must pay therefor in full, in money or money's worth.

3. CORPORATIONS—*credit for good-will on exchanging stock in corporations.* Where the property of one corporation is turned in as payment for stock in a new corporation, the crediting of a sum for the good-will of the old corporation is not warranted when its history is one of failure.

4. CORPORATIONS—*subscriber's liability where property given in payment for stock.* Where a subscriber for capital stock pays for his subscription in property that is overvalued, and the corporation agrees with him to take that property in full payment, the liability that is provided for in the statute (J. & A. ¶¶ 2425, 2442) remains in abeyance; and if subsequently the corporation ceases doing business, leaving debts unpaid, and goes into bankruptcy, the liability of the subscriber for the debts of the corporation, to the extent of the amount that his subscription is unpaid, becomes an affirmative, active, obligation, vesting in the trustee in bankruptcy, and may be sued upon only by him.

5. APPEAL AND ERROR—*when failure to raise point in brief not cured in reply brief.* A point not made in the original brief cannot be considered upon being raised in appellant's reply brief.

6. CORPORATIONS—*where creditor cannot enforce stockholder's subscription liability after conclusion of bankruptcy proceedings against corporation.* As the right to sue upon unpaid subscriptions to the stock of a bankrupt corporation vests in the trustee in bankruptcy, a decree in a suit by a creditor for such balance dismissing the bill for want of equity will be affirmed where the record shows that the bankruptcy proceedings were concluded before complainant began his suit.

Appeal from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1920. Affirmed. Opinion filed October 5, 1921.

ERIC WINTERS, for appellant.

R. C. MERRICK, for appellees; WILLIAM GRAHAM, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The complainant, Joseph T. Ryerson & Son, a creditor of the Illinois Architectural Iron Works (hereinafter called the Illinois Company), on behalf of itself and all creditors who might become parties, brought suit by a bill of complaint in equity against the Illinois Company and all its stockholders under section 25, ch. 32, Hurd's Rev. St. (J. & A. ¶ 2442); charging that the Illinois Company had ceased doing business leaving debts unpaid and that the stockholders while acting as directors of the Illinois Company had accepted from themselves certain property—in full payment of their subscriptions—which was of far less value than the par value of the stock for which they had subscribed.

It was alleged that the Illinois Company had ceased doing business leaving debts unpaid, and was indebted to the complainant on July 15, 1914, in the sum of $7,222.14, less a dividend of $1,444.49 paid thereon in the bankruptcy court on July 20, 1914, and another dividend paid by the same court on November 27, 1914, in the sum of $975.03; that there was due the complainant at the time of beginning suit the sum of $4,802.92, with interest at 5 per cent per annum from July 15, 1914. All the defendants answered the bill of complaint and admitted the indebtedness of the Illinois Company to the complainant as alleged. They denied, however, that they were guilty of any fraud; and set up that the property turned over by the subscribers in payment of their stock was of the full face value of the stock; and, further, that on May 5, 1913, the Illinois

Company was adjudged a bankrupt and a trustee duly appointed; that its estate was, then, fully administered and distributed among its creditors, and any right of action against them, the defendants, on account of any alleged overvaluation of the property given in payment of subscriptions to the stock of the Illinois Company, passed to and vested in the trustee in bankruptcy, and that as a result the complainant is now barred from bringing this suit. A replication was filed, and the cause then referred to Master in Chancery Dobyns.

The evidence shows substantially the following:

On July 14, 1910, the South Chicago Architectural Iron Works (hereinafter called South Chicago Company) was incorporated with a capital stock of $10,000, fully paid in money, and proceeded to engage in the manufacture and installing of iron work. On November 30, 1910, the capital stock was increased to $25,000, and $15,000 additional capital paid in in money. The capital stock was then held as follows:

| | | |
|---|---|---|
| Albert Rentner | 90 shares | $ 9,000 |
| Andrew H. Hansen | 100 shares | 10,000 |
| Christine Hansen | 5 shares | 500 |
| Thomas J. Peden | 33 shares | 3,300 |
| F. W. Garbe | 20 shares | 2,000 |
| Leah E. Peden | 2 shares | 200 |

All the stockholders, except Leah E. Peden, were directors. Hansen was president, Peden, vice president, and Rentner, secretary and treasurer. The additional capital was used to make certain improvements and in general for corporate purposes. On January 16, 1912, the directors resolved to organize a new corporation with the name of Illinois Architectural Iron Works, with a capital stock of $50,000. That was done, and on March 1, 1912, all the stockholders, the two Hansens, the two Pedens, Garbe and Rentner, of the South Chicago Company, in considera-

tion of their promise to cancel and surrender all the certificates of the capital stock of the South Chicago Company and to satisfy all its debts, bought all the property, real and personal, of that company, and assumed all its obligations. On March 7, 1912, the same persons sold all the property—they had just bought from the South Chicago Company—to the Illinois Company, in payment of their capital stock subscriptions to that company aggregating $50,000, being the total amount of the capital stock of the new company. The latter company took over from them the said property, but with the obligation that it would "assume and pay all outstanding obligations of every kind."

In obtaining the charter of the Illinois Company no mention was made of the fact that the new company was to "assume and pay all outstanding obligations" of the old company, and it was therein recited that there was none of the $50,000 capital stock that was not paid in full.

The report of the Commissioners to the Secretary of State contained the following:

| "Name | Shares | Amount |
|---|---|---|
| Thomas J. Peden | 50 | $ 5,000.00 |
| Leah E. Peden | 5 | 500.00 |
| Christine Hansen | 7½ | 750.00 |
| Andrew H. Hansen | 150 | 15,000.00 |
| Albert Rentner | 135 | 13,500.00 |
| F. W. Garbe | 30 | 3,000.00 |
| Albert Rentner | 122½ | 12,250.00 |
| Total | 500 | $50,000.00 |

Amount of capital stock actually paid in..................$50,000.00
Amount of capital stock not paid in ................    **None**

Capital paid in property, appraised as follows:

| | |
|---|---|
| Real estate (lots 13, 14, 15, 16, 17 and the E ½ of 18 in Calumet and Chicago Canal & Dock Company's subdivision of parts of Sections 5 and 6, Township 37 No., Range 15 East of the 3rd P. M., in Cook County, Illinois ............ | 22,000.00 |
| Machinery and tools.......... | 9,500.00 |
| Stock of metals, manufactured iron and other mdse........ | 8,500.00 |
| Contracts for work and materials of the net value of...... | 5,000.00 |
| Bills and accounts receivable, of the net value of............ | 2,500.00 |
| Good will and trade name of business heretofore conducted by the subscribers to said capital stock under the name of South Chicago Architectural Iron Works ...............$ | 2,500.00 |
| All the above mentioned property is the property heretofore belonging to and used by the South Chicago Architectural Iron Works and which was by it transferred to the subscribers to the capital stock of said Illinois Architectural Iron Works and which have been appraised by the undersigned commissioners in the amounts set forth................... | |

Total ..................$50,000.00''

Rentner not only subscribed for 135 shares as his own personal property, but subscribed for 122½ shares as treasurer of the company, as trustee, he says, for the parties interested. After the company was organized he turned back into the treasury of the company a certificate for $12,500.

In the resolution of March 7, 1912, whereby the Illinois Company bought the property that had formerly belonged to the South Chicago Company, it was recited that "it appears" that the property "is necessary for the business of the company and is of the fair value of fifty thousand ($50,000.00) dollars."

The business of the South Chicago Company was carried on until June 1, 1912, and after that in the name of the Illinois Company.

On April 3, 1913, a petition was filed in the United States District Court to have the Illinois Company adjudged a bankrupt. Daniel P. Trude was elected trustee. Ryerson & Son, the complainant herein, filed a claim of $7,222.44 against the estate. It was allowed, and afterwards two dividends were paid thereon, one of 2 per cent and one of 13½ per cent, aggregating $2,419.52. Nothing further has been paid. In April, 1913, the Illinois Company ceased doing business, and, after the dividends above mentioned were declared, the assets were exhausted.

The real estate which was turned over to the Illinois Company in the value of $22,000, is 170 feet by 148½ feet on 95th street, and abuts on the Belt railroad. Wuerfel said it was worth on March, 1912, $11,880 exclusive of the buildings. Moynan put it at the same figure. Brooks valued it at $12,622; Hansen at $10,000; Ringman, at $3,700, and Durland at the same figure. Schoening valued the buildings at $14,753.56; Jones, at $12,462.74; Hansen at $13,000; Durland at $4,200; Ringman at $5,300. Peden valued the whole property at $22,000. The whole property was actually bought in 1910 for $6,200; in 1916, at the trustee's sale, for $6,800; and on March 1, 1917, sold for $9,000. The profit and loss account of the South Chicago Company for the 23 months from July 1, 1910, to May 31, 1912, show a net loss of $9,754.33.

A financial statement, prepared by Rentner, the secretary and treasurer of the South Chicago Company, and dated March 1, 1912, and which he says was sub-

mitted to other stockholders about that date, shows, assets of $52,609.95 and liabilities, exclusive of $25,000 of capital stock, of $27,410.81.

The master found that as the stockholders turned in property of the value of $50,000, subject to obligations of $12,500, the capital stock was only paid for to the extent of $37,500, and the defendants became liable for the creditors of the company for 25 per cent of the par value of the shares acquired by them. He further found that as the Illinois Company had been adjudicated a bankrupt and a trustee had been appointed, he became vested with the exclusive right to collect from the stockholders whatever might be due from them to the creditors, arising out of the fact that the stockholders had paid for their stock by overvalued property; and that as in the year 1913, the Illinois Company (the defendant) was adjudicated a bankrupt and a trustee was appointed, the right of the complainant to maintain an action against the stockholders on the ground that their stock had been paid for in property that had been fraudulently overvalued was extinguished; and recommended accordingly, that the bill of complaint (the second amended bill of complaint) should be dismissed for want of equity. Objections were filed on behalf of both complainant and defendants and on September 24, 1919, counsel for the complainant withdrew certain objections.

On September 26, 1919, the chancellor entered a decree overruling exceptions to the master's report, and dismissing the bill of complaint for want of equity, at complainant's costs.

An analysis of the evidence leads to the conclusion that the property which the defendants turned over to the Illinois Company did not equal in value the amount of the stock subscribed for. The history of the South Chicago Company shows that it was conducted at a loss, and, yet, the defendants in turning over prop-

erty to the new company credited themselves with $2,500 for good-will. Rentner, the secretary and treasurer, told how the stock of the Illinois Company was paid for. He says the South Chicago Company needed money, and that they concluded to create a new company with a greater capital stock, and, as the real estate of the old company had increased in value, it was thought proper in turning over the old assets to the new company that it should be put down at the increased valuation. He further says, however, that at the time of the transfer the value of the assets was only $37,500. There is some claim on behalf of the defendants that as Rentner subscribed for 122½ shares, which he says he subscribed for because he was treasurer, and which was subsequently to be considered as treasury stock, that it was not necessary to turn over any money or property to the new company in order that 122½ shares of stock should be paid for. The trouble with that contention, however, is that the subscribers in their report to the Secretary of State announced that there was no "capital stock not paid in." Further, the Illinois Company when it took over the property from the defendants, according to their resolution of March, 1912, assumed an indebtedness of $12,500, and if all the property it received was worth, as Rentner says, only $37,500, the net value of what it received was only $25,000. The defendants, in the report of the commissioners filed with the Secretary of State, got credit for $2,500 for "good-will" but obviously the history of the South Chicago Company, which was one of failure, warranted no such claim. As the court said in *William E. Dee Co. v. Proviso Coal Co.*, 290 Ill. 252: "If a going concern has made no money no one would pay any more for it because it was going." Then, too, Rentner says that some time after, in the latter part of May, 1912, they discovered from the books that the South Chicago Company had lost money, and that then

they charged back on the books of the Illinois Company the sum of $12,500 which was credited to profit and loss, and charged to treasury stock, making a total of $23,900 of so-called treasury stock.

In the *Dee* case, *supra,* the court said: "Property may be taken in payment for stock, but it must be done by a valid contract of bargain and sale. Payment with property for capital stock is no payment except to the extent of the true value of the property, and if property is taken at an overvaluation the stockholders are liable to make up the deficiency." A subscriber to capital stock must pay in full in money or money's worth. In that case the court further said: "There is not the slightest reason to question the good faith or the honesty of plaintiffs in error or any reason to suppose that they had any evil design against creditors or the public. Of course, they did not anticipate a business failure, but when it occurred the law must put upon them the burden of proof that the property had a cash value equal to the capital stock."

We are of the opinion that the deficit in the value of the property turned over was far greater than the amount of the claim of the complainant.

There remains to be considered the question whether the exclusive remedy was vested in the trustee in bankruptcy. In determining that question it is necessary to consider the statutes and the decisions and law of this State. *Converse v. Hamilton,* 224 U. S. 243.

Section 47a, of the National Bankruptcy Act, as amended in 1910, is as follows: "* * * and such trustee, as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies and powers of a

judgment creditor holding an execution duly returned unsatisfied. * * * "

Section 70 of the same Act, as revised in 1910, is as follows:

"a. The trustee of the estate of a bankrupt * * * shall * * * be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt, * * * to all * * * (4) property transferred by him in fraud of his creditors; (5) property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him. * * *

"b. The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of the adjudication. * * * "

The Illinois Company was adjudged a bankrupt and Trude was appointed trustee May 9, 1913. He took over all the assets and appraised them. He states that the assets were exhausted and paid out in dividends. Nowhere does he mention any stockholder's liabilities. We assume, therefore, that the trustee never claimed nor attempted to enforce the statutory liability of the stockholders under sections 8 and 25. The question then remains to be answered, whether the fact that the Illinois Company had been adjudged a bankrupt, a trustee duly appointed, its estate administered upon by the bankruptcy court, now prevents the complainant from bringing this suit, based upon the statute, for the unsatisfied portion of its claim against the defendants who were stockholders of the Illinois Company.

Counsel for the complainant contends that the right of the trustee to sue depends upon whether the liability of the stockholder for the unpaid portion of his

subscription was an asset of the corporation; and that, if it was, then the corporation before, and the trustee after bankruptcy, could sue; that, in the instant case, if the property was of less value than the amount of the subscription, the acceptance of it by the corporation as payment in full was binding upon the corporation, though not upon the creditors; that if the corporation could not recover from the stockholders before bankruptcy, the trustee, deriving all his rights from the corporation, could not thereafter.

On the other hand, counsel for the defendants contend that the cause of action vested in the trustee, even though the corporation had agreed to accept the property of inferior value as payment in full.

The essential statutory provisions of our law, that are pertinent to the question involved are the following:

Section 8 (2 Jones & Add. Ann. Stat. ¶ 2425): "* * * each stockholder shall be liable for the debts of the corporation to the extent of the amount that may be unpaid upon the stock held by him. * * * Whenever any action is brought to recover any indebtedness against the corporation, it shall be competent to proceed against one or more stockholders at the same time to the extent of the balance unpaid by such stockholders. * * * Every assignee or transferee of stock shall be liable to the company for the amount unpaid thereon, to the extent and in the same manner as if he had been the original subscriber."

Section 25 (2 Jones & Add. Ann. Stat. ¶ 2442): "If any corporation * * * shall dissolve or cease doing business, leaving debts unpaid, suits in equity may be brought against all persons who were stockholders at the time, or liable in any way, for the debts of the corporation, by joining the corporation in such suit; and each stockholder may be required to pay his *pro rata* share of such debts or liabilities to the extent of the unpaid portion of his stock after exhausting the assets of such corporation."

It will be seen that section 8 is substantive law that every stockholder is liable for the debts of the corporation to the amount that his stock is unpaid.   That obligation arises upon the subscription being made, and remains unqualified, and section 25 in no way alters its exhaustive and binding character.   It may be said, however, that the Supreme Court, by its interpretation, has made one qualification or limitation, and that is that a corporation, which has made a binding contract with a stockholder to accept property of an inferior value for his subscription, cannot itself sue the stockholder upon his subscription.   *Parmelee v. Price,* 208 Ill. 544.   No Illinois case is to be found, however, that holds that the trustee in bankruptcy may not sue, notwithstanding an agreement upon the part of the corporation to accept certain property in full payment of a stock subscription.   Counsel for the complainants cite *In re Jassoy Co.,* 178 Fed. 515.   But the statute of New York provides that the holder of stock "shall be personally liable to its creditors," etc., while that of Illinois simply announces that "each subscriber shall be liable for the debts of the corporation to the extent of the amount that may be unpaid," etc. The latter is an unqualified liability, the former a liability only to creditors.

In New York, under its statute, where the liability is directly to the creditor, the trustee has no right to sue. Likewise in Minnesota, *Courtney v. Georger,* 228 Fed. 859, whereas in New Jersey and Ohio the right is in the corporation and goes to the trustee in bankruptcy. *In re Remington Automobile & Motor Co.,* 153 Fed. 345; *Kiskadden v. Steinle,* 203 Fed. 375.

In general, as to the scope and function of a trustee in bankruptcy, the United States Supreme Court said, in a case of some antiquity, *Sawyer v. Hoag,* 17 Wall. 620, and which arose out of the bankruptcy of an Illinois insurance company:

"And, in any controversy which might or could

grow out of the matter between the insurance company and the appellant, we are not prepared to say that the company, as a corporate body, could deny that the stock was paid in full.  And on this consideration one of the main arguments on which the appellant seeks to reverse the decree stands.  He assumes that the assignee in bankruptcy is the representative alone of the corporation, and can assert no right which it could not have asserted.  The weakness of the argument is in this assumption.  The assignee is the representative of the creditors as well as the bankrupt. He is appointed by the creditors.  The statute is full of authority to him to sue for and recover property, rights and credits, where the bankrupt could not have sustained the action, and to set aside as void, transactions by which the bankrupt himself would be bound. All this, of course, is in the interest of the creditors of the bankrupt.''

In *Lane v. Nickerson*, 99 Ill. 284, the court said:

''But the unpaid subscriptions sought to be collected were a part of the assets of the corporation, and hence they passed by the decree in bankruptcy to Harvey, the assignee, and he alone was, thereafter, the party in whose name suit must have been brought for their collection.  *Sanger v. Upton*, 1 Otto (91 U. S.) 56; *Erwin v. United States*, 7 Otto (97 U. S.) 392; *Glenny v. Langdon*, 8 Otto (98 U. S.) 20.  Nor does the fact that the assignee has failed (for whatever cause it may have been) to bring the suit within two years from the date of his appointment, give creditors the right to bring such suits in their own names.  *Trimble v. Woodhead*, 102 U. S. (12 Otto) 647.''

Other cases that are significant are the following: *Pullman v. Railway Equipment Co.*, 73 Ill. App. 313; *Edwards v. Schillinger*, 245 Ill. 231; *Coleman v. Howe*, 154 Ill. 458; *Farber v. National Forge & Iron Co.*, 50 Ill. App. 503; *Turner Bros. v. Alabama Min. & Mfg. Co.*, 25 Ill. App. 144; *Seegmiller v. Day*, 249 Fed. 177; *In re Beachy & Co.*, 170 Fed. 825; *Scovill v. Thayer*, 105 U. S. 143.

We are of the opinion that, where a subscriber for capital stock pays for his subscription in property that is overvalued and the corporation agrees with him to take that property in full payment, the liability that is provided for in sections 8 and 25 remains in abeyance; and, if subsequently, the corporation ceases doing business leaving debts unpaid, and goes into bankruptcy, the liability of the subscriber for the debts of the corporation to the extent of the amount that his subscription is unpaid becomes an affirmative active obligation, vests in the trustee in bankruptcy and may be sued upon only by him.

In appellant's reply brief it is further contended by counsel for the complainant that even though the trustee had the right to bring the action his failure to do so constituted a waiver, and left the right in the creditor. No such point was made in the original brief and so cannot now be considered.

Being, therefore, of the opinion that the right to sue vested in the trustee, and as the record shows that the bankruptcy proceedings were concluded before the complainant began this suit, the decree will be affirmed.

*Affirmed.*

O'CONNOR, P. J., and THOMSON, J., concur.