(No. 15316.—Reversed and remanded.)

LINDEN BROS., Appellant, *vs.* THE PRACTICAL ELECTRICITY AND ENGINEERING PUBLISHING COMPANY *et al.*—(JOSEPH G. BRANCH and ACORS W. RATHBUN, Appellees.)

*Opinion filed June 20, 1923—Rehearing denied October 4, 1923.*

1. CORPORATIONS—*stockholders must pay money or its equivalent for their stock—creditors.* The capital stock of a corporation is a trust fund for the security of creditors of the corporation, and the law requires stockholders to give money or money's worth to the full amount of their subscriptions, and money or money's worth means cash or its equivalent.

2. SAME—*payment for stock with property must be made in good faith.* Where corporate stock is paid for by turning property over to the corporation, the property must reasonably be worth the sum at which it is taken, the transaction must be equivalent to a valid contract of bargain and sale made in good faith and in the exercise of honest judgment, and the property can be taken only at its fair cash market value, and if it has no market value it can be taken only at such price as could be realized when selling it to others for cash.

3. SAME—*when good will of a business has no value.* The good will of a business, or the probability that old customers will continue their custom or trade and recommend the business to others, may be valued at the sum which any person would be willing to give for the chance of being able to keep the trade and continue the business at a profit, but where the business has never been carried on at a profit but has always been a financial failure there is no value in the good will.

4. SAME—*when property taken in payment for stock in publishing company has no value.* A party who has been engaged in publishing a magazine does not, by turning over the magazine's subscription list, discharge his liability for his subscription for stock in a new corporation organized to take over the business of publishing the magazine, where the business had never been operated at a profit and there is no showing that the loss was due to mismanagement that might be corrected.

5. SAME—*party shown on books as legal owner of stock cannot avoid liability as trustee.* Creditors of a corporation are not bound to look beyond the legal owner of shares of capital stock and may hold those liable for unpaid stock who appear to be such legal owners on the books of the corporation, and although a transfer of

stock certificates has not been made in accordance with the by-laws of the corporation, the transferee cannot avoid liability on the ground that he took the stock as trustee where the certificates were transferred to him as legal owner and he appears on the books of the corporation as such owner and not as trustee.

THOMPSON, J., dissenting.

APPEAL from the First Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding.

GEORGE C. OTTO, and EDWARD OSGOOD BROWN, for appellant.

ROY M. MERRICK, for appellee Joseph G. Branch.

PADEN & KROPF, for appellee Acors W. Rathbun.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

On January 30, 1917, the appellant, Linden Bros., a corporation, recovered in the municipal court of Chicago a judgment against the Practical Electricity and Engineering Publishing Company, a corporation, for $2104.87 and costs. An execution was issued and returned "no property found and no part satisfied," and the appellant filed its creditor's bill in the circuit court of Cook county on February 8, 1917, under section 25 of the Corporation act of 1872 as amended, to enforce an alleged liability of the appellees, Joseph G. Branch and Acors W. Rathbun, stockholders, on the alleged ground that their shares of stock were not paid for but were claimed to have been paid for with property of no substantial value. The answer of the corporation and Branch denied that the property taken to pay for the capital stock was of no value and alleged that it was equal in value to the total capital stock. The defendant Rathbun answered that he subscribed for one share of stock merely as a matter of

form in order that he might be qualified for director of the corporation and was not the owner of any other stock. The issues were referred to a master in chancery, who took the evidence and reported the same with findings of fact showing that the material allegations of the bill of complaint were proved, and he recommended that a decree should be entered in accordance with the prayer of the bill. The chancellor sustained exceptions of the defendant Rathbun to the findings of the master and entered a decree dismissing the bill for want of equity. The appellant prosecuted an appeal to the Appellate Court for the First District, and that court having affirmed the decree, granted a certificate of importance and an appeal to this court.

The questions to be determined are whether the capital stock was paid for and whether Acors W. Rathbun was a stockholder, and on those questions Rathbun and the other appellee have filed separate briefs and arguments.

There was no dispute in the evidence except in opinions as to the value of the property taken in full payment for the capital stock.

Joseph G. Branch had received an extensive and liberal education in the science and practice of engineering and the uses of electricity and was skilled in those matters and had published books on the subjects. In November, 1910, he commenced the publication of a magazine in Chicago called *Practical Electricity and Engineering.* He used the name Practical Electricity and Engineering Company, but there was then no corporation of that name and he was the sole owner. The magazine was issued monthly and the subscription price was one dollar a year, or one dollar and fifty cents for two years, one-half of which was paid to the agent who procured the subscription. The Henry O. Shepard Company, a printing corporation, furnished the material, did the work and paid the postage on the magazine. From the first publication the receipts were always insufficient to pay running expenses, and Branch gave his notes

to the Shepard Company from time to time for amounts due.   Up to August, 1912, the loss in the business amounted to $31,000, and Branch was indebted to the Shepard Company in that amount for producing the magazine and the cost of mailing.   On August 8, 1912, a contract was made between Branch and the Shepard Company by which he agreed to incorporate the Practical Electricity and Engineering Company with a capital stock of $50,000, fully paid; that no transfer of stock should be made while the corporation or Branch was indebted to the Shepard Company unless the proceeds were applied to the debts due that company and that he would not use the stock issued to him as collateral security for borrowing money from any other source than the Shepard Company.   The Shepard Company was to furnish $155 a week to apply on expenses and to produce the magazine, with the exception of furnishing paper.   Branch deposited with the Shepard Company two policies of insurance upon his life.   He made a contract with the Moser Paper Company to furnish paper for the magazine for one year.   The Moser Paper Company furnished paper for seven months for the magazine but received no pay and refused to furnish further.   After the seventh month the Shepard Company continued to do the printing and furnished paper and expense money weekly. The Moser Paper Company, which had furnished paper, sued the corporation and secured judgments to the amount of $4321.49.   Rathbun was director and treasurer of the Shepard Company and participated in the plan of Branch and that company to form a corporation to take over the business of publishing the magazine, with the understanding that the corporation was to assume and pay the indebtedness of Branch to the Shepard Company.   In pursuance of that arrangement, on August 14, 1912, Branch, Rathbun and Nellie L. Frost, a clerk for Branch, filed with the Secretary of State an application for the incorporation of the Practical Electricity and Engineering Publishing Company

with a capital stock of $50,000, divided into 500 shares of $100 each, for the purpose of publishing the magazine. A license was issued to the petitioners as commissioners to receive subscriptions to the capital stock. Branch subscribed for 497 shares, Rathbun for one share, Nellie L. Frost for one and J. L. Williams for one. The commissioners reported to the Secretary of State that the subscriptions had all been paid "in property appraised as follows: A circulation of 14,000 subscribers, together with advertising contracts of value and a good will of said publication and the person now owning the same, being a minimum value of $50,000." Branch was made president and director, Rathbun treasurer and director, Nellie L. Frost director and secretary, and Williams director. The corporation published the magazine at a continuous loss as before, and on August 26, 1913, the corporation was indebted to the Shepard Company in the sum of $54,534.35 for producing and mailing the magazine. The corporation had no visible property except a few cuts and stencils worth a few dollars, and the claim of the Shepard Company being worthless, the contract of August 8, 1912, was canceled and the Shepard Company canceled the indebtedness and returned the two life insurance policies. After the Shepard Company quit, the appellant, Linden Bros., printed the magazine and took notes of the publishing company, on which it subsequently recovered judgment. In March, 1915, the publication of the magazine was discontinued for lack of means to carry it on any longer, and during the last few months of its existence agents were paid seventy-five per cent of moneys received for subscriptions. When the corporation was formed the magazine had a paid subscription list of 14,000 subscribers and did some advertising.

There is no uncertainty about the law or the justice of it and the duty of the courts to enforce it in accordance with its language and intent. The capital stock of a corporation is a trust fund for the security of those who deal

with the corporation, and the stockholders are bound to make it good to creditors. The law requires stockholders to give money or money's worth to the full amount of their subscriptions, and money or money's worth means cash or its equivalent. Payment for stock may be made in property, and when payment is so made the property must be reasonably worth the sum at which it is taken. If property has an ascertainable market value it can only be taken at its fair cash market value, and if it has no market value it can only be taken at such price as could be realized when selling it to others for cash. The transaction must be equivalent to paying money for the property, and must constitute a valid contract of bargain and sale made in good faith and in the exercise of judgment fairly and honestly exercised. *Coleman* v. *Howe,* 154 Ill. 458; *Farwell* v. *Great Western Telegraph Co.* 161 id. 522; *Sprague* v. *National Bank of America,* 172 id. 149; *Garden City Sand Co.* v. *American Refuse Crematory Co.* 205 id. 42.

One of the items included in the application for incorporation in representing that the stock was fully paid for was the good will of the publication and the person then owning the same, and there is an extended argument for the appellant with respect to the value of the good will, but it was not claimed by either of the appellees that the good will had any value whatever, and that is manifestly true. The good will of a business may be of great value in the probability that old customers of a concern will continue their custom and recommend it to others, and such value is the sum which any person would be willing to give for the chance of being able to keep the trade connected with a business that has been carried on with a profit. There is no value in the good will of a losing business such as this, which was a financial failure. *Dee Co.* v. *Proviso Coal Co.* 290 Ill. 252.

The only claim made before the master or now made is that the subscription list of 14,000 paid subscriptions was

worth $50,000, (the total capital stock,) and that turning over that subscription list to the new corporation was payment in full for the capital stock. A witness testified that he published *Golfer's Magazine* and *Veterinary Medicine* and was interested in seven other publications as a stockholder. He gave it as his opinion that a subscription list from 14,000 to 15,000 paid-up subscriptions to a magazine such as *Practical Electricity and Engineering* was of the value of between $40,000 and $75,000. Another witness who had been connected with publications relating to electricity and machinery, when examined by the appellees and asked what was the fair reasonable cash market value of from 14,000 to 15,000 paid subscriptions to a magazine such as *Practical Electricity and Engineering*, gave no direct answer. He said that it was a pretty hard question to answer; that he would have to make some provisions for other things connected with it; that a paid circulation ought to be worth in the neighborhood of $40,000, he should think; that the value of a paid subscription list consisted in getting advertising; that the advertising rates and ability to get advertisements depended entirely on the subscription list; that if the receipts from subscriptions and advertising from the inception of the publication were insufficient to pay running expenses, that would not make any difference as to the value of the subscription list and the paper at the time it was purchased; and that subsequent incumbrances might be careless management that might impair the value of the subscription list when bought. A witness for the appellant who was advertising and circulation manager for the *Inland Printer* said that a paid subscription list would be a liability until it would get to a point where advertising would pay, and that the different parts of the business could not be separated and the value placed on one but the whole thing was a unit. All the evidence was that the profit in publishing a magazine is in the advertising, and that the rates and amount of advertising depend on

the paid-up subscriptions, from which an advertiser is assured that the subscribers will take the magazine during the period for which they have paid and will see his advertisement. There is no market in which such property as was transferred to the corporation is bought and sold, so that there was no market value to be ascertained and proved, and it was not essential that there should be. The value could be proved by those who knew from observation and experience what such property would sell for in cash. The conclusion cannot rest on pure opinion based on no fact, and there was no evidence in this case of any sale or that any witness knew of any sale of such property and no substantial basis in any fact stated for the opinion of the witness that the subscription list was worth from $40,000 to $75,000. It was only contended that the subscription list was of value, and that such value was in producing revenue from advertising. With the 14,000 paid subscriptions advertising in the magazine did not pay and the business was a continuous failure. The subscription list was for this magazine, and there was no ground for separating the different elements of the property turned over to the new corporation as a unit and concluding that anyone buying it would allow $40,000 or $50,000 for the subscription list. The only possibility that anyone would pay for a losing business would be that the business had been mismanaged and the purchaser might contemplate an improvement that would produce revenue, but there was nothing of that kind in this case. The management was in the hands of Branch, a man of very great learning and ability, and there was not the slightest indication of any mismanagement that a purchaser could correct. The master was justified in his findings concerning the value of the property taken in payment for the capital stock. The facts proved far outweighed the opinion of a witness based on values, in general, of subscription lists and ignoring material facts in the case.

The defense of Acors W. Rathbun was that he was not a stockholder. He testified that he took one share of the stock, for which he paid nothing, and he was one of the applicants for incorporation and became a director and treasurer. · He was not entitled to say to a creditor that he incurred no· liability because his subscription was in order that he might be qualified as a director and enabled thereby to investigate its affairs with the Henry O. Shepard Company. He was a director and treasurer of the Shepard Company and one of the trustees of the estate of Henry O. Shepard, deceased, and as such trustee was one of the holders of the majority of the capital stock of the Shepard Company. He had been connected with that corporation for twenty-two years, and during all the time of the transactions with Branch he was an active manager of the Shepard Company. He knew and understood the scheme for the incorporation of the Practical Electricity and Engineering Publishing Company. The certificate issued to him for one share was No. 3, and he testified that he put his name on the back of it and did not see it again until it was produced in the suit of the Moser Paper Company. Stock certificates numbered 1 and 2 were issued to Branch for fifty shares each, and they were transferred under date of September 5, 1912, by indorsements to Rathbun and delivered to him. His defense was that in taking that stock he occupied a trust relation and took the certificates for the Shepard Company and therefore he incurred no liability. The transfer was noted on the stubs of the stock certificate book of the corporation by filling blanks for the purpose, and the stub so filled up showing the transfer was signed by Rathbun. He testified that he put the certificates in the office safe of the Shepard Company and all equitable rights were in that company. Conceding that to be true, Rathbun was not relieved from statutory liability. The certificates were transferred to him as the legal owner, and he stood

on the books of the corporation as such owner and not as trustee. Creditors are not bound to look beyond the legal owner of shares of capital stock and may hold those liable who appear to be such legal owners. Section 23 of the Corporation act exempts from personal liability one holding stock as a trustee, but to be entitled to such exemption the trust must appear. If, in fact, Rathbun held the stock as trustee for the Shepard Company and there was a relation between them which made the Shepard Company liable, it must be settled between them. A by-law of the corporation was in evidence which provided for transfer by indorsement of the stock certificate and surrender to the secretary for cancellation and a new certificate to be issued to the transferee, but it makes no difference whether the transfer was in accordance with that by-law or not. Rathbun appeared to be the legal owner, and whether he was trustee for the Shepard Company and whether or not he left his certificate for one share with the corporation, or what he did with the certificates numbered 1 and 2, is a matter of indifference. *Wheelock* v. *Kost,* 77 Ill. 296; *Laing* v. *Burley,* 101 id. 591; *Sherwood* v. *Illinois Trust and Savings Bank,* 195 id. 112; *Gillett* v. *Chicago Title and Trust Co.* 230 id. 373.

The judgment of the Appellate Court and the decree of the circuit court are reversed and the cause is remanded to the circuit court, with directions to enter a decree in accordance with the prayer of the bill.

*Reversed and remanded, with directions.*

Mr. JUSTICE THOMPSON, dissenting.