(No. 65760

MARIA P. O'HARA, Appellant, v. AHLGREN, BLU-
MENFELD AND KEMPSTER *et al.*, Appellees.

*Opinion filed March 29, 1989.*

WARD and CALVO, JJ., took no part.

McKenna, Storer, Rowe, White & Farrug, of Chicago (David M. Nelson and James P. DeNardo, of counsel), for appellant.

Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Alvin R. Becker and Howard A. London, of counsel), for appellees.

JUSTICE MILLER delivered the opinion of the court:

Maria P. O'Hara, surviving spouse and sole beneficiary of the estate of deceased attorney Barratt O'Hara II, filed a breach of contract action in the chancery division of the circuit court of Cook County against the law firm of Ahlgren, Blumenfeld and Kempster and against

two of its partners, Robert D. Ahlgren and Barry E. Blumenfeld. The complaint alleged that, pursuant to a contract between Mrs. O'Hara and the defendants, Mrs. O'Hara had transferred the goodwill associated with the name of her deceased husband's law practice to the defendants, and that the defendants had failed to compensate her for it according to the terms of their agreement. Mrs. O'Hara sought an accounting, damages, costs and attorney fees, injunctive relief, and termination of the contract. Following cross-motions for summary judgment, the trial court denied Mrs. O'Hara's motion and granted summary judgment for the defendants. Mrs. O'Hara appealed that part of the order that granted summary judgment for the defendants. The appellate court, with one justice dissenting, reversed the trial court, concluding that the contract at issue violated public policy and that neither party was entitled to relief. The appellate court then remanded the case to the trial court with directions to dismiss the complaint. (158 Ill. App. 3d 562.) We allowed Mrs. O'Hara's petition for leave to appeal from the appellate court's judgment (107 Ill. 2d R. 315).

Barratt O'Hara II (O'Hara) was a licensed attorney who practiced law in Chicago, primarily in the immigration and naturalization field, until his death on December 28, 1978. During his last illness, his wife contacted an unnamed attorney and asked him to assist her husband with certain active cases. The attorney agreed and proceeded to work on various active files up to and following O'Hara's death.

In March 1979, Mrs. O'Hara contacted defendant Ahlgren and asked him to take over the work then being performed by the other attorney. The defendant agreed, and, following his conversation with Mrs. O'Hara, drafted an agreement which he then mailed to her.

The agreement called for the merger of Mrs. O'Hara's deceased husband's law practice with the defendants' law firm. Under the terms of the contract, the defendants were given the right to purchase the furniture and furnishings of the O'Hara office (provided the parties could agree on a price) and the right to all current and former files and records of the practice. The defendants also received the exclusive right to use a specified telephone number and to use the name Barratt O'Hara on their stationery and office door.

In exchange, the contract provided that the defendants were to compensate Mrs. O'Hara by paying her one-third of the net income derived from the O'Hara practice prior to the physical merger of the two offices. Following the merger, Mrs. O'Hara was to receive 25% of the gross receipts attributable to the O'Hara practice for the first year, with her percentage of the receipts decreasing at the rate of 5% per year and then terminating at the end of the fifth year. Income derived from the O'Hara practice was defined as those fees received from cases involving Barratt O'Hara's past or current immigration clients and from cases involving future clients developed from past or current clients. Mrs. O'Hara was also to receive, at her request, an accounting of the sums due her for five years after the merger and, in any event, at least once a year. The final paragraph of the agreement stated, "It is expressly understood that Maria P. O'Hara is being compensated as aforementioned for the good will attributed to the law firm of Barratt O'Hara II." On March 19, 1979, the parties signed the agreement. It is uncontested that Mrs. O'Hara entered the contract without the advice of counsel and that the defendants were aware of that fact.

Sometime after entering into the agreement, Mrs. O'Hara signed a letter which was sent to former and current clients of her husband. The letter notified the cli-

ents of Barratt O'Hara's death and advised them that all files opened by O'Hara in the past 30 years had been referred to the defendants. The letter also informed the clients that the defendants were competent attorneys who were well known in the field of immigration law and assured the clients that pending matters would be handled promptly and carefully.

According to the defendants' accounting records, between March 1979 and January 1983, they collected fees totaling approximately $120,000 which were subject to the terms of the agreement. Of that amount, $11,500 was remitted to Mrs. O'Hara.

On September 15, 1982, Mrs. O'Hara filed a complaint in the circuit court of Cook County alleging in each of three counts that she had contracted to transfer the goodwill associated with her late husband's law practice to the defendants and that she had performed her part of the bargain. Mrs. O'Hara further alleged that the defendants had received substantial sums of money subject to the terms of the agreement but that, despite repeated requests to do so, the defendants had failed to account for the receipts or to pay her the sums due her. Mrs. O'Hara sought an accounting, actual and punitive damages, interest, costs and attorney fees, injunctive relief and termination of the contract.

The defendants answered by denying the allegations contained in the complaint and by raising an affirmative defense in which they claimed that Mrs. O'Hara lacked the capacity to transfer any goodwill associated with her husband's law practice and that the alleged contract was not supported by legal consideration. Mrs. O'Hara responded to the affirmative defense by asserting that the defendants should be estopped from denying the validity of an agreement which they had prepared and from which they had benefitted.

On August 30, 1983, Mrs. O'Hara filed a motion for partial summary judgment, claiming that the defendants' own accounting records indicated that she was entitled to at least an additional $11,350 under the agreement. The defendants responded by filing a cross-motion for summary judgment in which they contended that an agreement to transfer the goodwill of a deceased attorney's law practice to another attorney violates public policy and that they were therefore entitled to judgment as a matter of law. Additionally, the defendants argued that, in this case, the method of compensating the beneficiary of the estate constituted a fee-sharing arrangement with a nonattorney and thus violated the policy reflected in Rule 3—102 of the Illinois Code of Professional Responsibility (107 Ill. 2d R. 3—102). Defendants argued that because the terms of the contract violated public policy and because the parties were equally at fault, or *in pari delicto*, the contract was unenforceable against either party.

Mrs. O'Hara responded to the defendants' motion by stating that there was a question of fact concerning the nature of the consideration involved and suggesting that the contract was intended only to compensate her for the value of legal services rendered by Barratt O'Hara before his death. Mrs. O'Hara also argued that the defendants had failed to identify any public policy violated by the transfer of a deceased attorney's goodwill to a successor attorney. Finally, Mrs. O'Hara stated that although the defendants had claimed that she was *in pari delicto* with them, they had not shown that she acted with the same degree of knowledge or turpitude as the defendants. The circuit court denied Mrs. O'Hara's motion for partial summary judgment and granted summary judgment for the defendants.

On appeal, the appellate court reversed the trial court and remanded the case with directions to dismiss the

complaint. Focusing on the fee-splitting provision in the contract, and relying on its prior opinion in *Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, the court concluded that public policy considerations preclude a fee-sharing arrangement where there is absolutely no showing of a sharing of legal services or responsibilities. The court in *Corti* had reasoned that fee-sharing arrangements between attorneys "[are] injurious to the best interests of the clients concerned because [they] reduce[ ] the motivation of [lawyers] to use their best efforts in resolving the clients' cases." (*Corti*, 93 Ill. App. 3d at 523.) Consequently, the court in *Corti* declined to lend judicial approval to the agreement at issue there "because it endanger[ed] the clients' right to receive their attorneys' complete care and consideration in the disposition of their legal affairs." (*Corti*, 93 Ill. App. 3d at 524.) In the present case, the appellate court concluded that the same public policy considerations which, absent a sharing of services or responsibilities, preclude attorneys from splitting fees among themselves also prevent attorneys from sharing fees with nonlawyers. The appellate court rejected Mrs. O'Hara's contention that she was not *in pari delicto* with the defendants because the defendants were attorneys and she was not. The appellate court held, therefore, that the contract was unenforceable and that neither party was entitled to relief.

One justice on the appellate panel dissented, believing that Mrs. O'Hara, a nonlawyer, was not *in pari delicto* with the defendant attorneys "because of their unequal contractual position." (158 Ill. App. 3d at 569 (Pincham, J., dissenting).) The dissenting justice also believed that the portion of the contract involving the sale of physical property was severable from the portion of the contract that the majority found invalid. The dissent noted that the exchange of a law firm's tangible assets for money is not against public policy, and concluded that this provi-

sion of the contract should have been enforced by the trial court.

In this court, both parties agree that the contract involved a division of legal fees by an attorney with a non-attorney. Mrs. O'Hara argues that in this case the fee-sharing provision did not violate public policy and that, if it did, the contract should be enforced nonetheless. However, the defendants contend that the appellate court was correct when it refused to enforce the contract, not only because the fee-splitting provision violates public policy but also because any agreement by an estate to transfer the goodwill of a deceased attorney is unenforceable, regardless of the method of compensation. Because we believe that the fee-sharing arrangement here violates public policy and should not be enforced, we need not consider here whether every contract to sell the goodwill associated with a deceased attorney's law practice is unenforceable.

Confining ourselves to the fee-sharing issue, we begin by restating the general rule that courts will not enforce a private agreement which is contrary to public policy. (*Board of Trustees of Community College District No. 508 v. Cook County College Teachers Union, Local 1600* (1979), 74 Ill. 2d 412, 424; *People ex rel. Nelson v. Wiersema State Bank* (1935), 361 Ill. 75, 94.) While the term "public policy" lacks precise definition (*Board of Trustees*, 74 Ill. 2d at 425), it may be stated generally as a legal principle which holds that no one may lawfully do that which has a tendency to injure the public welfare (*McClure Engineering Associates, Inc. v. Reuben H. Donnelley Corp.* (1983), 95 Ill. 2d 68, 71-72; *Knass v. Madison & Kedzie State Bank* (1933), 354 Ill. 554, 567). The public policy of this State is reflected in its constitution, its statutes and its judicial decisions. (*McClure Engineering*, 95 Ill. 2d at 72.) Whether or not a contract is contrary to public policy depends on the peculiar facts

and circumstances of each case. (*Board of Trustees*, 74 Ill. 2d at 425.) In deciding whether a contract that is not otherwise prohibited by law violates public policy, the courts must determine whether the agreement is so capable of producing harm that its enforcement would be contrary to the public interest.

Fee-sharing arrangements between attorneys and nonattorneys have been associated with a variety of harms. (See, *e.g.*, *Gassman v. State Bar* (1976), 18 Cal. 3d 125, 553 P.2d 1147, 132 Cal. Rptr. 675 (fee-splitting arrangements pose the possibility of control of clients' cases by laypersons); *In re Krasner* (1965), 32 Ill. 2d 121 (fee-splitting arrangements promote solicitation of clients); *In re Bonafield* (1978), 75 N.J. 490, 383 A.2d 1143 (fee-splitting arrangements facilitate the unauthorized practice of law).) The type of harm any particular fee-sharing arrangement may produce is dependent to some extent on the purpose of the contract and the other terms in the agreement. Having examined the present contract, we believe that the fee-splitting provision at issue here, if allowed, would be harmful to the public interest.

First, the fee-splitting agreement provides an incentive for a layperson to recommend the services of an attorney with whom he or she will share the fees. Because the nonattorney assumes no responsibility for the case, the referral will more likely be based on the layperson's desire to share a fee than on the layperson's concern for the legal welfare of the client. (See *Linnick v. State Bar* (1964), 62 Cal. 2d 17, 21, 396 P.2d 33, 35, 41 Cal. Rptr. 1, 3; *cf.* 107 Ill. 2d R. 2—107 (rule governing inter-attorney referrals requires that attorneys who receive compensation for referring clients to other attorneys assume legal responsibility for the client's case, thus insuring that client is referred to a competent attorney).) The public is best served, however, by recommendations un-

influenced by financial considerations. (See Model Code of Professional Responsibility EC 2—8 (1980).) While the contract here did not expressly require Mrs. O'Hara to recommend the defendants' services, she did so nevertheless. To insure that the defendants received any fees in which she would share, it was necessary that Barratt O'Hara's former clients be guided in the defendants' direction. Thus it was in Mrs. O'Hara's own best interest to recommend the defendants' services, and a failure on her part to do so would have worked to her financial detriment.

Second, the fee-sharing agreement here creates the possibility that the clients' rights may be adversely affected. Because the attorneys must share a portion of the fees received from certain clients, but not others, they may be tempted to devote less time and attention to the cases of the clients whose fees they must share. (See *Leoris v. Dicks* (1986), 150 Ill. App. 3d 350; *Corti v. Fleisher* (1981), 93 Ill. App. 3d 517.) Any reduction in the quality of legal services rendered by an attorney to a client creates a risk that the rights of the client may not be fully protected and results in prejudice to the client. Because of the harmful effects that fee-sharing agreements between attorneys and nonattorneys promote, such agreements are contrary to public policy.

In order to protect the public from such agreements, this court has adopted Rule 3—102 of the Code of Professional Responsibility (107 Ill. 2d R. 3—102), which prohibits attorneys from entering into fee-sharing arrangements with laypersons. Rule 3—102 provides:

"(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) An agreement by a lawyer with his firm, partner, or associate may provide for the payment of money, over a reasonable period of time after his

death, to his estate or to one or more specified persons.

(2) A lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that proportion of the total compensation which fairly represents the services rendered by the deceased lawyer.

(3) A lawyer or law firm may include nonlawyer employees in a retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement."

Mrs. O'Hara points out that this court's prohibition against fee splitting is not absolute since the rule contains three exceptions. Mrs. O'Hara initially attempts to bring the contract here within the rule's second exception, which permits payments to an estate for services rendered by the deceased attorney. Mrs. O'Hara contends that there is a question of fact concerning the meaning that the parties in this case attached to the word "goodwill" and suggests that the agreement was intended only to compensate her for fees earned by her late husband but collected by the defendants.

We find this argument without merit. "Goodwill" has been defined as "the probability that old customers of a concern will continue their custom and recommend it to others." (*Linden Brothers v. Practical Electricity & Engineering Publishing Co.* (1923), 309 Ill. 132, 137; *William E. Dee Co. v. Proviso Coal Co.* (1919), 290 Ill. 252, 257.) The terms of the contract between Mrs. O'Hara and defendants support the conclusion that the parties fully intended the purchase and sale of the goodwill associated with O'Hara's name. The contract allowed the defendants to use indefinitely Barratt O'Hara's name on their stationery and office door and permitted the defendants to continue using O'Hara's business telephone number. The contract further provided that the defendants would pay to Mrs. O'Hara a percentage of

any fees generated by clients referred to the defendants by Barratt O'Hara's clients. Each of these provisions is consistent with an attempt to transfer goodwill and not with payment for services rendered by Barratt O'Hara. We therefore conclude that there is no question but that the parties used "goodwill" in its ordinary sense and did not intend it to refer to fees earned, but uncollected, by Barratt O'Hara.

Mrs. O'Hara next argues that, if the fee-sharing agreement was a method of compensating her for her husband's goodwill, we should either interpret exception (2) to include payments for goodwill as well as for past services or we should adopt a new exception allowing payments for goodwill to the estate of a sole practitioner by a successor attorney, even absent any prior association or agreement between the lawyers.

Mrs. O'Hara argues that as presently written our rule allows the estate of a deceased attorney who practiced in association with other lawyers to realize the value of the goodwill acquired by the attorney before his or her death. Although not cited in her brief, Mrs. O'Hara apparently relies on ABA Opinion 327 (ABA Comm'n on Ethics and Professional Responsibility, Formal Op. 327 (1971)) for this proposition. This opinion interpreted DR 3—102 of the ABA Model Code of Professional Responsibility (which is almost identical to our Rule 3—102) to permit a law firm, in accordance with a preexisting retirement plan, to pay to the estate of a deceased partner an amount measured by earnings accrued after the partner's death. Mrs. O'Hara correctly states that the rule does not afford the same benefit to the estates of sole practitioners and concludes that the disparate treatment of the estates of deceased sole practitioners and deceased partners is inequitable. Her conclusion implies that there is no reasoned basis for allowing the present

exceptions to Rule 3—102 and not allowing the exception she proposes.

We disagree. As illustrated below, the currently recognized exceptions for payments to deceased attorneys' estates do not present the same type or degree of risk to the public as do the fee-splitting provisions advocated by Mrs. O'Hara. In view of the types of harm Rule 3—102 seeks to prevent, we do not believe that the exceptions to the prohibition against fee splitting should be enlarged to include the type of agreement at issue here.

First, partnership agreements allowing for payments to an estate do not create the same probability that the heirs of the estate of a deceased attorney will recommend the services of a preexisting partnership to others for financial reasons alone. While the benefits paid to an estate pursuant to a preexisting retirement plan may be based on future receipts, they are to be measured by the earnings of the firm. (See ABA Opinion 327; see also *Corti v. Fleisher*, 93 Ill. App. 3d at 531.) Thus, the estate will receive some benefit whether or not any additional clients are induced to retain the firm's services. In contrast, under a contract such as the one entered into by Mrs. O'Hara, in order for the estate to realize any benefit whatsoever from the agreement, it is necessary that the deceased attorney's former clients be persuaded to retain the successor attorney. Thus a recommendation of the successor's services by the estate is virtually inevitable. (See Minkus, *The Sale of a Law Practice: Toward a Professionally Responsible Approach*, 12 Golden Gate U. L. Rev. 353, 356 (1982); Sterrett, *The Sale of a Law Practice*, 121 U. Pa. L. Rev. 306, 307-08 (1972).) Moreover, even if the payments to the estate of a deceased partner were tied to fees generated by the deceased attorney's clients, there would be no necessity for the estate to recommend the services of the firm. In the case of partnerships, the clients are already familiar with the

firm, and any recommendation by the estate would serve little purpose.

Second, we do not believe the payments permitted to partners' estates present a risk that the lawyers continuing in the practice will devote less time and effort to clients' cases and thereby jeopardize the clients' interests. In the case of partnerships, the agreement to make such payments exists prior to the partner's death. Thus, the firm knows in advance that these amounts will be due after the partner's death and the firm will presumably take these payments into account when setting its fees. Because the firm has been collecting fees to cover these payments all along, there is less chance that services will be reduced as the payments become due. Moreover, because the payments to a deceased partner's estate are not tied to fees generated by any one group of clients but are based on firm earnings, the welfare of certain clients will not be placed at risk simply because their cases appear less lucrative. Under contracts such as the one at issue here, however, the attorneys will have an incentive to reduce the services provided to clients whose cases are encumbered by the fee-sharing agreement since the attorneys know they will retain only a fraction of the fees actually charged these clients.

Thus, if the current rule with its limited exceptions appears to treat estates of deceased partners differently from those of deceased sole practitioners, the difference is justified in terms of the differing potential for harm to the public. We therefore decline to interpret or modify our existing rule to accommodate the type of fee-sharing agreement present in this case. To do otherwise would be to sanction agreements which tend to injure the public and which are thus contrary to public policy.

Having determined that the fee-splitting arrangement here violated public policy, we must next decide whether it should be enforced nonetheless. Mrs. O'Hara argues

that even if her contract with the defendants violated public policy it should still be enforced because she and the defendants were not *in pari delicto*. Mrs. O'Hara contends that, because the defendants were lawyers and she is a layperson, she is not equally at fault with the defendants. Mrs. O'Hara points out that, as lawyers, the defendants' conduct was expressly prohibited by Rule 3—102, whereas her conduct was not similarly proscribed. According to Mrs. O'Hara, under these circumstances the court should enforce the contract. Although we have found some support for Mrs. O'Hara's position (see *Emmons, Williams, Mires & Leech v. State Bar* (1970), 6 Cal. App. 3d 565, 86 Cal. Rptr. 367; *Irwin v. Currie* (1902), 171 N.Y. 409, 64 N.E. 161), we are not persuaded.

Generally, where the parties to a contract against public policy are *in pari delicto*, or equally at fault, a court will not aid either party but will leave both parties where it finds them. (*Staufenbiel v. Staufenbiel* (1944), 388 Ill. 511, 519.) This rule is designed not to help any party but rather to protect the public. (*Schnackenberg v. Towle* (1954), 4 Ill. 2d 561, 565; *Vock v. Vock* (1937), 365 Ill. 432, 435.) It is believed that by refusing to enforce such contracts, courts will deter similar contracts in the future. S. Williston, A Treatise on the Law of Contracts §1630A (3d ed. 1972).

Although courts will generally not enforce contracts which are against public policy where the parties are *in pari delicto*, this is not to say a court must enforce an agreement when the parties are not *in pari delicto*. "[T]he interest of the public, rather than the equitable standing of the individual parties, is of determining importance." *Parish v. Schwartz* (1931), 344 Ill. 563, 572; see also *Schnackenberg v. Towle* (1954), 4 Ill. 2d 561, 569.

Assuming, without deciding, that Mrs. O'Hara is correct in her contention that the mere difference in the status of the parties suffices to establish that they were not *in pari delicto*, we do not believe that the public interest will be served by accepting her argument and enforcing the contract. Under Mrs. O'Hara's theory, every fee-sharing agreement between an attorney and a nonattorney which violates Rule 3—102 would be enforceable by the lay party since, by definition, such agreements will always involve an attorney and a nonattorney. Although consistent enforcement of such contracts against breaching attorneys might deter attorneys from entering fee-sharing agreements, presumably most lawyers are already deterred from such conduct by the existence of Rule 3—102 and by the possibility of sanctions that its violation carries. By refusing in every case to assist the lay party, courts may deter laypersons as well as attorneys from attempting such agreements. We believe that, in this way, the public will be protected more effectively from the potential harms posed by fee-sharing arrangements.

Mrs. O'Hara also contends that the defendants should be estopped from asserting, as a defense, the illegality of an agreement which they drafted and from which they benefitted. This argument is without merit. As this court has stated before, a party to a contract which is contrary to public policy is not precluded from raising its illegality as a defense. See, *e.g.*, *Hall v. Woods* (1927), 325 Ill. 114, 135; *Lyons v. Schanbacher* (1925), 316 Ill. 569, 574.

Finally, we note that we have no occasion to decide whether Mrs. O'Hara is entitled to enforce a contract for the sale of her deceased husband's office furniture and furnishings. The contract here dealt with an option to purchase these assets, and any subsequent agreement between the parties concerning their sale is not at issue

here. Moreover, Mrs. O'Hara has not asked for the enforcement of that portion of the contract in her complaint.

For the reasons stated, we affirm the appellate court's judgment reversing the circuit court's grant of summary judgment to the defendant and remanding the cause with directions to dismiss the complaint.

*Appellate court affirmed.*

WARD and CALVO, JJ., took no part in the consideration or decision of this case.