No. 2--07--0876      Filed: 12-4-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| GUY VENA, as Trustee of the Harry A. Vena Trust Dated February 28, 2002, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff and Counterdefendant-Appellee, | ) ) | |
| | ) | |
| v. | ) | No. 06--MR--1282 |
| | ) | |
| PHILIP VENA, | ) | |
| | ) | |
| Defendant and Counterplaintiff-Appellant | ) ) | |
| | ) | |
| (Michael Vena, Dennis Vena, Ronald Vena, | ) | |
| Richard Vena, Robert Vena, Linda Vail, | ) | |
| Susan Pelletier, Vanessa Gramarossa, Mark | ) | |
| Perrone, Guy Scott Vena, Thomas Vena, Lisa | ) | |
| Johnson, Jill Mell, Tara MacTavish, Joel Vena, | ) | Honorable |
| Philip Jaros, Patricia Herres, and Antoinette | ) | Kenneth L. Popejoy, |
| Jaros, Defendants). | ) | Judge, Presiding. |

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

Guy Vena, the trustee of a trust made by Harry A. Vena, brought a complaint for declaratory judgment. He asked the trial court to rule that, under a provision in the trust instrument by which an approval of the trustee's accounts by a majority of the "income beneficiaries" would have the same effect as court approval of the accounts, the accounts were approved. Guy named all the living beneficiaries of the trust as defendants. One beneficiary was Philip Vena, who answered and

counterclaimed, asserting that Guy had breached his duties as trustee. The court granted summary judgment to Guy in the declaratory judgment action and dismissed Philip's counterclaims as barred by the majority-approval provision. Philip appeals the summary judgment order entered on August 6, 2007, challenging the validity of the majority-approval provision. We reverse that judgment, concluding that the trial court erred in finding that provision to be enforceable. The provision violates public policy, as it would allow majority approval to insulate the trustee from liability for serious misconduct.

On February 28, 2002, Harry A. Vena executed a trust instrument in which he transferred certain property to his brother, Guy D. Vena, as trustee. According to the instrument, Guy was to use "all of the income of the trust and so much or all of the principal" as Harry might request or require for his support and comfort. On Harry's death, after paying certain debts, taxes, and expenses, the trustee was to distribute "the remaining principal and any accrued and undistributed income" in equal shares to 19 individuals (the 19).

The trust provision at issue, paragraph C of the fifth section, states that a "majority in interest of the persons described in Paragraph E may at any time approve the trustee's accounts or the accounts of the successor trustee with the same effect as if a court having jurisdiction over the trusts approved the accounts." Paragraph D provides that, "[i]f for any reason the successor trustee at any time acting fails to act as trustee, other than by having appointed a substitute trustee ***, a majority in interest of the persons described in Paragraph E may appoint as trustee any individual or any corporation situated in the United States and authorized under the laws of the United States or of any state to administer trusts." Paragraph E states that "[t]he income beneficiaries of the trusts are the persons who shall receive the notice of resignation of any successor trustee and a majority in interest

of the income beneficiaries may approve accounts and appoint successor trustees, as provided in Paragraphs C and D of this Article." The trust instrument does not otherwise specify what persons are entitled to notice of the resignation of any successor trustee, nor does it contain other provisions concerning the trustee's duty to account to the beneficiaries.

Harry died on November 9, 2003. In the spring of 2005, Guy began to make distributions to the 19. He collected documents entitled "Receipt and Release" from 18 of the 19--all except Philip. The 18 each acknowledged the receipt of $28,000 as a partial distribution, and each agreed to return the money if the trustee should need it to pay expenses or claims against the property. In the spring of 2006, Guy made another distribution, this one of $844.99. This was the final distribution. Guy obtained receipt and release documents from 13 of the beneficiaries.

On September 6, 2006, Guy filed a complaint for declaratory judgment. He placed the trust instrument before the court and asked the court to rule that, because he had the release documents, the accounts were approved as though the court had approved them. He alleged that, in June 2004, he sent the 19 a financial statement covering trust activities from November 9, 2003, through May 31, 2004. On July 27, 2004, he sent the beneficiaries two interim financial statements covering the period from May 1, 2002, through November 9, 2003. He alleged that all the beneficiaries but Philip "approved" the statements; his exhibits show that they signed the releases, but do not show that they gave any more specific approval. Finally, he alleged that Philip had threatened legal action over the distribution. For relief, he asked that the court declare the statements of account approved in accord with his interpretation of the trust instrument and asked the court to order him to take all steps necessary to close the trust.

Philip answered and counterclaimed. He disputed the enforceability of the majority-approval provision and alleged that Guy had breached his fiduciary duties by (1) failing to account to the beneficiaries, (2) providing inadequate and inaccurate statements, (3) mismanaging and wasting trust assets, (4) paying improper expenses, and (5) being negligent in his exercise of his power to sell real estate. He asked that the court order Guy to produce a final accounting and reimburse the trust for the expenditures that he asserted were improper. He also asked for punitive damages.

Guy filed a motion to dismiss the counterclaims under section 2--619 of the Code of Civil Procedure (Code) (735 ILCS 5/2--619 (West 2006)) and a motion for summary judgment on his own claim under section 2--1005 of the Code (735 ILCS 5/2--1005 (West 2006)), asserting that the approval of the accounts by the beneficiaries acted to defeat Philip's defenses and claims. He made clear that he had relied on the receipt and release documents as showing the approval of the accounts by a majority of the beneficiaries. However, with the motions, he provided new affidavits from 16 of the 19, which explicitly stated that they approved of the accounting. He also included an affidavit from one beneficiary stating that, because his overwhelming concern was for the preservation of the family's cohesion, he was approving the accounts. Guy and Philip also stipulated that, "with regard to Guy Vena's Complaint, there [was] no genuine issue as to any material fact." (Guy's complaint relied entirely on the effect of the trust instrument and the beneficiaries' approvals, so we understand the stipulation as an agreement to the genuineness of the instrument and the approvals.)

On August 6, 2007, the court granted summary judgment on Guy's complaint and dismissed Philip's countercomplaint.[1] At the hearing, using section 83, comment d, of the Restatement (Third)

---

[1]The trial court found Guy's section 2--619 motion to dismiss to be moot.

of Trusts (Restatement (Third) of Trusts §83, Comment d, at 206-07 (2007)) as guidance, the court ruled that the majority-approval provision was effective. Comment d, in relevant part, states:

> "The terms of trusts sometimes provide that the trustee need only account or submit reports to a designated person, for example, to one of the beneficiaries of the trust (or to the settlor of an irrevocable inter vivos trust), and that the approval of the trustee's account or report by that person shall discharge the trustee from liability. A provision of this type is effective, provided (i) the other person in giving approval acts neither in bad faith nor in casual disregard of the interests or rights of the nonassenting beneficiaries and (ii) the accounting appropriately discloses material issues about the trustee's conduct. (The provision does not eliminate a beneficiary's right to information under [the preceding section].) The designated person's approval, however, is subject to court review for abuse, with particular attention (see (i) above) to neglect or to the possible effects of a conflict of interests between that person and a beneficiary (or even to a settlor's disregard of beneficiary rights that the settlor has no power to modify). This review is available to a beneficiary regardless of a trust provision to the contrary, such as one purporting to make the trustee's discharge final or conclusive upon the designated person's approval." Restatement (Third) of Trusts §83, Comment d, at 207 (2007).

Based on its decision that the majority-approval provision was enforceable, the court further ruled that Philip could file a new action only if he could properly allege that the majority abused its power in approving the accounts. Philip filed a timely notice of appeal; he argues that the majority-approval provision is unenforceable because it improperly restricts judicial review of trustee acts and that we should therefore reverse the summary judgment.

We review a grant of summary judgment de novo. Buenz v. Frontline Transportation Co., 227 Ill. 2d 302, 308 (2008). A court should grant summary judgment only when the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2--1005(c) (West 2006); Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co., 227 Ill. 2d 102, 106 (2007).

The trial court here was confronted by an issue upon which essentially no precedent existed, so it turned to the Restatement of Trusts. The restatements are, of course, not binding on Illinois courts; they merely provide guidance. Ziemba v. Mierzwa, 142 Ill. 2d 42, 49 (1991); see also In re Marriage of Chrobak, 349 Ill. App. 3d 894, 898 (2004). We have no reason to decide here whether the trust provisions that section 83, comment d, describes are in fact permissible under Illinois law. The provision here, as the parties agree, goes beyond what comment d endorses; without deciding whether a provision strictly modeled on comment d would be enforceable under Illinois law, we hold that the provision in Harry's trust is contrary to public policy because of the limitations it places on redress for serious trustee misconduct.

At the outset, we note that our preliminary reading of the trust instrument left us uncertain whether the 19 could be considered "income beneficiaries" at all; it seemed possible that they were remainder beneficiaries only and thus had never been proper voters. In the trial court, both parties and the court itself assumed that the 19 became income beneficiaries on Harry's death. But to decide the enforceability of the majority-approval provision, we must address novel questions of law that we would not have addressed had a proper interpretation of the trust instrument precluded an effective approval by the 19. We therefore asked the parties for supplemental briefing on the interpretation

of "income beneficiaries." That briefing has persuaded us that the 19 are "income beneficiaries" by the terms of the trust instrument.

When Harry made the trust, the 19's interests were classic remainder interests. See 760 ILCS 15/2(c) (West 2006) (defining "remainderman" for the Principal and Income Act (760 ILCS 15/1 et seq. (West 2006)) as "the person entitled to principal, including income which has been accumulated and added to principal"); see also Black's Law Dictionary 1317-18 (8th ed. 2004) (defining "remainder" as a "future interest arising in a third person--that is, someone other than the estate's creator, its initial holder, or the heirs of either--who is intended to take after the natural termination of the preceding estate"). That, however, is not decisive here.

The 19's original status does not mean that they cannot now be income beneficiaries under the terms of the trust. Even if a trust instrument requires that the trustee distribute the corpus as soon as the original beneficiary dies, the distribution process will take some time, so that, if the trust includes income-producing assets, the remainder beneficiaries will inevitably receive some accrued income with their distributions of principal. In some contexts we would regard such receipt of income as merely incidental, an artifact of the unavoidable delays in trust administration, but here the structure of the trust instrument shows that the settlor intended the phrase "income beneficiaries" to include the 19 once they had a present right to distributions. We recap the provisions that point in that direction.

Paragraph C of the instrument's fifth section states that a "majority in interest of the persons described in Paragraph E may at any time approve the trustee's accounts." Paragraph D of that section provides that, "[i]f for any reason the successor trustee *** fails to act as trustee ***, a majority in interest of the persons described in Paragraph E may appoint [a] trustee." Paragraph E

states that "[t]he income beneficiaries of the trusts are the persons who shall receive the notice of resignation of any successor trustee and a majority in interest of the income beneficiaries may approve accounts and appoint successor trustees, as provided in Paragraphs C and D of this Article."

The use of the phrase "a majority in interest" points to the settlor having contemplated that the primary trust[2] would sometimes have more than one income beneficiary. As the settlor was the only income beneficiary when he made the trust, the use of this phrase strongly suggests that he contemplated that plural others--the 19--would later be "income beneficiaries."

Further, we take one purpose of the fifth section of the instrument to be to produce continuity in trustees. This purpose would be compromised if it became inoperative upon the death of the original beneficiary.

A final minor, but telling, indicator points toward the 19 becoming income beneficiaries: only "income beneficiaries" are entitled to notice of a trustee's resignation. Surely Harry intended that there would always be someone entitled to that notice. On Harry's death, the 19 became the only possible candidates for "someone."

Having concluded that the trust instrument contemplated that the 19 could approve the accounts, we now must decide what effect to give their approval. We conclude that it should have none: the majority-approval provision too thoroughly deprives an individual beneficiary of the ability to enforce his or her rights and too thoroughly insulates the trustee from accounting to a court.

---

[2]Under some circumstances, the trust instrument would cause the trustee to make distributions in further trust, thus creating secondary trusts. The potential existence of these secondary trusts can explain the use of the plural at several points in the trust instrument.

As the trial court noted, comment d states that a settlor may give one designated person the power to approve the trust accounts and discharge the trustee from liability. The provision in Harry's trust differs from the class of provisions endorsed by comment d in two ways. First, the trust substitutes majority approval for approval by a designated person. Second, where comment d states that the approval can discharge the trustee from liability, Harry's trust instrument states that the approval has the "same effect as if a court having jurisdiction over the trusts approved the accounts." We start by considering the effect of that second difference.

In the ordinary course of a private trust's administration, no reason exists for a court to approve the trustee's accounts. Under standard trust administration, the trustee furnishes the eligible beneficiaries with a current account, and that account becomes binding on each beneficiary unless he or she, within three years, institutes an action against the trustee. 760 ILCS 5/11(a), (b) (West 2006). The result of this is that the court will "approve[] the accounts" only to the extent necessary to reject a specific claim; it does not routinely review them and give them its overall imprimatur. Thus, to say that the approval has the "same effect as if a court having jurisdiction over the trusts approved the accounts" has no clear meaning. The provision seems to assign res judicata effect to the majority's approval, despite the fact that approval of the accounts may never go before a court.

Both parties agreed in oral argument that the effect of the phrase is such that an approval constitutes an irreversible discharge of the trustee, but that an aggrieved minority beneficiary might in some circumstances have a cause of action against the majority. We accept that interpretation for purposes of this litigation, as it is not plainly wrong. Under the parties' interpretation, however, the provision is more preclusive than the comment d model. Comment d implies that an aggrieved beneficiary could go to court to undo the designated person's approval. Comment d states that a

"provision of [the kind described] is effective, provided (i) the other person in giving approval acts neither in bad faith nor in casual disregard of the interests or rights of the nonassenting beneficiaries and (ii) the accounting appropriately discloses material issues about the trustee's conduct." (Emphasis added.) Restatement (Third) of Trusts §83, Comment d, at 206 (2007). If an approval, and the resulting discharge of the trustee, are ineffective in some circumstances, a mechanism must exist for showing the ineffectiveness. That is, a beneficiary could go to court to have the approval declared ineffective. The parties agree that the provision here does not provide that safety mechanism.[3]

We also point out that both parties have assumed that the enforcement of the majority-approval provision is an all-or-nothing matter. That is, neither party has suggested that the provision is enforceable except to the extent that it, for example, prevents a beneficiary from raising a claim of bad faith by the trustee. We therefore will not consider the possibility that the provision is partially enforceable, and we hold that the preclusion of trustee liability makes it unenforceable.

---

[3]If a majority approval has the same effect as a court approval, presumably a beneficiary would be able to attack the approval by means of an analogue to a petition under section 2--1401 of the Code (735 ILCS 5/2--1401 (West 2006)). Judging by the tenor of the parties' remarks, we take it that they would conclude that a section 2--1401 analogue would not be a way for a beneficiary to raise objections that he or she had or could have reasonably had at the time of the approval. Any problem with the accounts that the beneficiary raised at the time of the approval thus would not be the basis for a successful section 2--1401 analogue. Further, we can think of no other procedural method by which an aggrieved beneficiary may demonstrate the impropriety of the majority's approval.

American trust law uniformly recognizes that a settlor has the right to set conditions on his or her gifts, but also recognizes that a gift or right under the trust that is unenforceable is illusory. Thus, while a settlor can limit a beneficiary's ability to go to court to enforce gifts and rights, the settlor must leave enforcement power such that the trust does not devolve into something else. "[S]ince the [beneficiaries] have no right to demand that any gift be made, *** they can hardly be said to have any right to control the action of the settlor *** in limiting the number of persons authorized to object to the acts of the trustee." In re Application of Central Hanover Bank & Trust Co., 176 Misc. 183, 186, 26 N.Y.S.2d 924, 927 (N.Y. Sup. Ct. 1941). On the other hand, "[a] settlor who attempts to create a trust without any accountability in the trustee is contradicting himself. *** If the court finds that the settlor really intended a trust, it would seem that accountability in chancery or other court must inevitably follow as an incident." G. Bogert & G. Bogert, Trusts and Trustees §974, at 467 (2nd ed. rev. 1983).[4]

Guy argues that it is sufficient that a trustee be accountable to a court when a majority will not approve his or her conduct. We disagree. We do not think that the majority-approval provision is an effective mechanism for holding a trustee to his or her duty. Thus, the provision is an improper method for exculpating the trustee of serious misconduct--of acts done in bad faith, of intentional breaches of trust, or of breaches of trust committed with reckless indifference to the interest of the beneficiary.

---

[4]Illinois law is clear that the trust instrument cannot entirely insulate the trustee from court review of his or her actions. See Maguire v. City of Macomb, 293 Ill. 441, 453 (1920) (noting that the discretion of the trustee is subject to the control of a court of chancery); see also In re Estate of Thomson, 139 Ill. App. 3d 930, 935-36 (1986).

A majority-approval process does not provide effective oversight of the trustee for two reasons. First, responsibility is too diffused. Second, the trustee has too much control over the process.

The diffused responsibility of the majority-approval process makes it likely that beneficiaries will make an uninformed choice. Reviewing accounts is work--generally tedious work--and, if one is not familiar with accounting conventions, difficult work. It is useless for a beneficiary to be part of a minority of informed beneficiaries; to have an effect, one must be part of the majority. If a majority is not doing the work to become informed, becoming informed is futile for an individual beneficiary. Thus, one can expect an informed majority only if the majority is conscientious and the beneficiaries trust one another to be conscientious also. On the other hand, if each beneficiary expects the other to make an informed choice, each may be tempted to rely on the others. Much of this problem could be solved if all the beneficiaries met and deliberated. In those circumstances, an informed beneficiary could hope to display his or her mastery of the information and sway the votes of the others. But nothing in the provision suggests that deliberations will occur; indeed, it does not even require a vote of all the beneficiaries.

The trustee controls release of the accounts and thus controls the conditions under which the beneficiaries approve the accounts. Nothing we can see would prevent the trustee from presenting the accounts to the group of beneficiaries he or she perceived as most likely to approve the accounts and collecting approvals from a majority before the more resistant beneficiaries even see the accounts. Given the flexibility a trustee would have in arranging the conditions of the approval, some trustees would reasonably conclude that they could use the approval process as a rubber stamp. The actions perfunctorily approved could include ones done with bad faith under a conflict of interest.

We note that nothing in the majority-approval provision or the law in general requires any beneficiary to consider any interest but his or her own. To be sure, we suggested that an aggrieved beneficiary might sue the majority beneficiaries if the majority beneficiaries conspired to harm the minority. But, for example, suppose a beneficiary received a final distribution consistent with what he or she expected. We can think of nothing that would prevent him or her from approving the accounts on that basis alone, without considering whether the trustee had treated all the other beneficiaries similarly. A provision like this one is almost an invitation to a trustee who is seeking exculpation from misconduct to set the interests of the majority against those of the minority.

Trust provisions that exculpate a trustee of serious misconduct raise public policy concerns. In Axelrod v. Giambalvo, 129 Ill. App. 3d 512, 517 (1984), a First District panel, citing cases from five states, two treatises, and section 222(2) of the Restatement (Second) of Trusts (Restatement (Second) of Trusts §222(2), at 516 (1959)), concluded that exculpatory clauses in trust instruments are enforceable, but not as to "breaches of trust committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary." Like the Axelrod court, we believe that section 222 is an accurate reflection of the direction of the common law in Illinois. We find comment b in that section to be a particularly useful guide:

"Notwithstanding any provision in the terms of the trust relieving the trustee from liability for breach of trust, he is liable for breaches of trust committed in bad faith, and for intentional breaches of trust, and for breaches of trust committed with reckless indifference to the interest of the beneficiary. No provision in the terms of the trust is effective to relieve the trustee who derives a profit from a breach of trust from liability to the extent of the profit.

Such provisions as these are invalid on the ground that it would be contrary to public policy to give effect to them." Restatement (Second) of Trusts §222, Comment b, at 517 (1959).[5] In part, this section merely follows from the principle we have already noted: "A settlor who attempts to create a trust without any accountability in the trustee is contradicting himself. *** If the court finds that the settlor really intended a trust, it would seem that accountability in chancery or other court must inevitably follow as an incident." G. Bogert & G. Bogert, Trusts and Trustees §974, at 467 (2nd ed. rev. 1983). That is, if no one can hold the trustee to account, no trust exists at all. But the comment--properly, in our view--goes beyond that principle. A trust would not become illusory simply because a provision exculpated a trustee of an act done with reckless indifference, but the comment disapproves such provisions as violating public policy.

Breaches of the fiduciary duties of trustees are wrongs, and the law generally will not countenance provisions that excuse willful or reckless wrongdoing. Hence the rule noted by the Axelrod decision. Similarly, contracts exculpating a party from the results of willful and wanton misconduct are illegal. Falkner v. Hinckley Parachute Center, Inc., 178 Ill. App. 3d 597, 604 (1989).

Of course, the rules about exculpatory clauses deal with prospective exculpation, whereas we are concerned with the possibility of retrospective exculpation. That weakens the public policy concern, but, given the specifics of this provision, does not sufficiently alleviate it. A trustee acting under a blanket exculpation clause has no external reason to behave as a proper fiduciary, whereas a trustee who must seek exculpation after the fact at least must convince those with the exculpatory power of the propriety of his or her actions. However, in light of the diffusion of responsibility and

---

[5]The analogous provisions of the Restatement (Third) are not yet released.

the potential for manipulation by the trustee, we deem this provision an insufficient improvement over a blanket exculpation.

In so holding, we are not suggesting that a designated-person approval provision strictly modeled on section 83, comment d, would necessarily violate Illinois public policy. Certainly, such a provision still would give the designated person the power to exculpate the trustee of serious misconduct, and the existence of such a power raises the same concerns. However, countervailing considerations exist. By far the most important is that comment d, as we discussed, allows a court to undo a designated-person approval, so that a trustee could still face liability. Also, designated-person approval may mitigate the problems stemming from diffusion and manipulation. In any event, we need not resolve these issues here.

The decision whether an agreement is contrary to public policy depends on the particular circumstances of the case. O'Hara v. Ahlgren, Blumenfeld & Kempster, 127 Ill. 2d 333, 341-42 (1989). A majority-approval provision in a trust established in a very different context, such as a business trust where all the beneficiaries were also the settlors, might lead us into different considerations than those that were decisive here.

The parties debate the effect of section 3(1) of the Trusts and Trustees Act (760 ILCS 5/3(1) (West 2006)) on the acceptability of provisions like the one at issue. We deem it to be inapplicable. Section 3(1) provides that "[a] person establishing a trust may specify in the instrument the rights, powers, duties, limitations and immunities applicable to the trustee, beneficiary and others and those provisions where not otherwise contrary to law shall control, notwithstanding this Act." 760 ILCS 5/3(1) (West 2006). The parties agree that immunizing a trustee from any requirement to account or from all court review of his or her accounting would be against public policy and thus "contrary

to law" under section 3(1). 760 ILCS 5/3(1) (West 2006). We have concluded that the level of oversight provided by the majority approval is similarly, if less obviously, insufficient. It is thus contrary to law, so that section 3(1) cannot save it.

Because the majority-approval provision is unenforceable, the trial court erred in granting summary judgment in favor of Guy. We therefore reverse the judgment and remand the cause.

Reversed and remanded.

McLAREN and BURKE, JJ., concur.